STATE OF CONNECTICUT *v.* REGINALD ROGERS
(13388)

DUPONT, C. J., and HEIMAN and HENNESSY, Js.

Argued May 1—decision released August 22, 1995

*Lawrence R. Pellett,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Stephen J. Sedensky III,* assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[1] two counts of conspiracy in violation of General Statutes § 53a-48,[2] aiding and abetting sexual assault in the first degree in violation of Gen-

---

[1] General Statutes § 53a-92 provides in pertinent part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

eral Statutes §§ 53a-70[3] and 53a-8,[4] and attempted assault in the first degree in violation of General Statutes §§ 53a-59[5] and 53a-49.[6] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court. On appeal, the defendant asserts that the judgment is fatally flawed because (1) he was deprived of his constitutional right to notice of the charges against him, (2) the evidence was insufficient to support a finding of guilty on the charge of aiding and abetting sexual assault in the first degree, (3) the trial court improperly refused to permit the defendant to inquire of a witness what the witness had testified to at a prior trial, (4) the state failed to make available to the defendant a copy of the trial testimony of that witness at a prior trial, and (5) the trial court improperly denied motions for judgment of acquittal with respect to the conspiracy counts. We affirm the judgment of the trial court.

---

[3] General Statutes § 53a-70 provides in pertinent part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[4] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[5] General Statutes § 53a-59 provides in pertinent part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[6] General Statutes § 53a-49 provides in pertinent part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

The jury could reasonably have found the following facts. On August 24, 1991, the victim resided in building seventeen, apartment 209, of Father Panik Village in Bridgeport. She lived in that apartment with Michael Epps, her fiancee, and Lois Grace, a person who had been involved in raising Epps. The victim had resided in that apartment since March, 1991. In the evening, the victim was going downstairs to leave the building when she was met at the bottom of the stairs by John Wideman, who was standing on the other side of a closed gate. Wideman complained about the gate's being closed and locked and asked the victim why she kept closing and locking the gate. The victim then returned upstairs.

Shortly thereafter, the victim again descended the stairway. Wideman was again at the gate, but this time he was accompanied by the defendant and a group of other men, including Maurice McNeil and Kevin Rogers. As the victim was opening the gate, one of the men told her that she could not continue to keep the gate closed. The victim knew, however, that none of the men lived in building seventeen and that they used the hallway of the building to sell drugs. Someone suggested that because the victim continued to keep the gate closed, that she should either be beaten or be required to engage in fellatio with the entire group. The defendant was present when this suggestion was made. The group of men proceeded to force the victim back up the stairs to a landing in the hallway. McNeil removed his belt and began hitting the post on the steps with the belt. The victim began to cry. Kevin Rogers told her not to be stupid, that she was going to be punished for keeping the gate closed and that she was going to perform fellatio on all of them. Someone fondled the victim while she stood with her back against the wall, and she told the men that she did not want to be beaten nor did she want to perform fellatio.

The men surrounded the victim and took her outside. They were looking for Epps so that the victim could be forced to tell Epps that she was "Kevin's bitch." The men could not find Epps in the area, however, so Kevin Rogers instructed two individuals who were outside of building seventeen, Nicholas Wardlaw and James Blackwell, to take the victim to building thirteen.

The group moved the victim to building thirteen, with Wardlaw and Blackwell on either side of her and the others about ten feet behind her. The defendant positioned himself behind the victim to her left. The victim did not try to run away because she knew that the men would catch her and beat her severely. She also knew that no one would come to her assistance. The victim had seen both the defendant and Kevin Rogers beat people. She had seen the defendant kick people and beat them with sticks, and she had seen the others jump on people, beat them to the ground, stomp on them and turn their dogs loose on them. In addition, she had seen members of the group hit people with pipes and clubs.

The group took the victim to a third floor apartment belonging to Maria Brown. Brown was Epps' cousin and was also a former girlfriend of the defendant. Brown was not staying at the apartment at the time, however, the defendant was staying there. The apartment door was opened with a key provided by the defendant. The men took the victim inside the apartment and ordered her into the bathroom. They instructed her to remove her clothes, to take a shower, to come out naked and to lie down on a mattress that was on the living room floor. A discussion ensued as to who was going to "go first." Scott Sheffield, a member of the group who had just arrived at the apartment, volunteered to be first. Sheffield was told to get on the mattress and pull down his pants. The victim was ordered to perform fellatio on Sheffield. Sheffield began

giggling and clowning around and he was ordered to get up from the mattress. Kevin Rogers told Sheffield to go out and get some condoms, because four of the individuals, including the defendant, had indicated that they wanted to engage in vaginal intercourse as well as in oral intercourse with the victim.

The victim was then ordered to perform fellatio on Wardlaw. She again began to cry and was again told by Kevin Rogers to stop or she would be beaten and still be forced to perform sexual acts on her attackers. As she was performing fellatio on Wardlaw, Wright inserted a beer bottle into the victim's vagina. Kevin Rogers also brought his son, who was approximately eighteen months old, into the room. Kevin Rogers gave the child a piece of ice, instructed him to place it on Wardlaw's chest, and when the child had done so, ordered the victim to lick it off.

Blackwell was told that he was next. He laid down on the mattress and the victim indicated reluctance to engage in further acts of fellatio. Wright pushed the victim against a stereo wall unit that was in the living room and she bumped her head against the unit. Wright ordered the victim to perform fellatio on Blackwell and she did. While she was performing fellatio on Blackwell, McNeil began to strike the victim on her buttocks with a belt. The defendant told McNeil that he was not beating her properly, took the belt from McNeil and demonstrated how he thought that the belt should be used. McNeil took the belt back from the defendant and began hitting the victim on the buttocks again.

During the time that the victim was being forced to perform fellatio on the men in the apartment, the other men, including the defendant, were drinking beer and watching. In addition, the defendant and the others were jeering at and cheering on the men who were having fellatio performed upon them by the victim.

At the time of the assaults upon the victim, Epps was in building thirteen looking for her. Epps went up to the door of the apartment where the victim was being held and listened at the door. He heard loud music and voices, including the voice of the defendant. Epps heard the men laughing and telling the victim that she should "do it right or she wouldn't know what happened to her." Epps also heard the victim crying, and he banged on the door of the apartment.

The victim heard the banging on the door and heard Epps outside the door calling to her. She was told to get up and go into the bathroom, and was then taken into the bathroom and the door was closed behind her. The victim heard someone open the front door and heard Epps' voice. She also heard someone tell Epps that she was not there. Epps left and the victim was ordered out of the bathroom and directed to perform fellatio on Wideman. After she had become engaged with Wideman, she and the others heard the police outside. The police were talking about building thirteen, apartment 309. The victim's attackers, realizing that the police were coming upstairs, again ordered the victim to go into the bathroom. While the victim was in the bathroom, she attempted to dress herself. The police did not come to the apartment where the victim was being held. She heard people descending the stairs and heard the police vehicles driving away. When the police left, the defendant and several others also left the apartment. The victim was again directed to come out of the bathroom. When she came out into the room, Wideman insisted that she undress and again perform fellatio on him.

While the victim was performing fellatio on Wideman, someone knocked on the front door. Wideman opened the door and went outside. He returned shortly thereafter and started cleaning up the area. The victim got dressed and asked if she could leave. Wideman

told her that she could leave when he and the others left. The victim asked if they had done anything to Epps, and she was told that they had been unable to find him.

When the victim was finally permitted to leave the apartment, she went looking for Epps and found him at Bridgeport Hospital. She saw him at the hospital at approximately 11 p.m. on the night of the assaults upon her. Epps was at the hospital being treated for injuries that he received from being beaten by the defendant and some of the other persons involved in the sexual assaults upon the victim. Epps claimed that he had a belt placed around his neck and that his assailants tried to take him back to the third floor apartment. When they were unable to do so, they hit him with the belt, kicked him, stomped on him with their feet and beat him for about twenty minutes. Before the men left, the defendant picked up Epps, swung him around in the air and threw him into the back of a car. Epps could not move after the beating and was left bleeding and lying on the ground. A friend of his eventually brought him to the hospital for treatment. Epps and the victim left the hospital that evening and returned to building seventeen. The victim did not call the police to report what had happened to her that evening because she was frightened. She knew that she had to return to the village and she did not have anywhere else to go.

The next day, August 25, 1991, while the victim was outside building seventeen, she was accosted by Kevin Rogers, Wright and the defendant. The men were looking for Epps. They told her to tell Epps that they were going to kill him because he was acting as if he were in love and because he had called the police on them the previous evening. They also informed the victim that they were not finished with her and that they were going to come back and "get" her that night. The victim went upstairs and told Epps what had just trans-

pired and Epps decided to call the police. When the police arrived, the victim told them about the sexual assaults upon her the previous evening and the police took the victim to the hospital emergency room. At the hospital the victim told an attending physician and a social worker that she had been sexually assaulted and she described the conduct of the persons involved in the assaults.

I

The defendant first asserts that he was deprived of his constitutional right to fair notice of the charges against him because four informations were filed before the conclusion of the trial. The defendant posits that the filing of seriatim informations caused confusion and constituted a deprivation of his right to notice.[7] We are unpersuaded.

The following additional facts are necessary for the resolution of this claim. On January 15, 1991, the state filed the first of four informations. In the first information, the state charged the defendant with committing the following crimes on August 24, 1991, at building thirteen, apartment 309 of Father Panik Village: kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), threatening in violation of General Statutes § 53a-62 (a) (1), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), aiding and abetting a sexual assault in the first degree in violation General Statutes §§ 53a-8 and 53a-70 (a) (1), assault in the second degree in vio-

---

[7] In his brief, the defendant alleges that he was put to plea on only the first of these four informations. Our review of the transcript, however, reveals that the defendant was also put to plea on the third information, the information read to the jury at the commencement of trial. The defendant claims no impropriety in the failure of the state to put him to plea on each of the informations, but limits his claim to an assertion that the number of informations filed against him caused confusion and, therefore, deprived him of his right to fair notice.

lation of General Statutes § 53a-60 (a) (2), and assault in the first degree in violation of General Statutes § 53a-59 (a) (3). On January 21, 1992, the defendant pleaded not guilty to each of the counts of the information. On May 12, 1992, the state filed a disclosure notifying the defendant that all offenses for which he was charged as a principal included charging his liability as an accessory.

On May 14, 1992, the state filed a substitute information against the defendant. See Practice Book § 623.[8] This first substitute information differed from the initial information in that the defendant was further accused of conspiracy to commit the following crimes: kidnapping in the first and second degree; sexual assault in the first and third degree; and assault in the first, second or third degree. In addition, it changed the charge of assault in the first degree to attempted assault in the first degree and deleted the charges of threatening and unlawful restraint.

On August 31, 1992, the state filed a second substitute information. This information further refined the charges against the defendant and alleged that on August 24, 1991, at or near buildings thirteen and seventeen in Father Panik Village, the defendant had committed kidnapping in the first degree, conspiracy to commit kidnapping in the first degree, conspiracy to commit sexual assault in the first degree, aiding and abetting sexual assault in the first degree, attempted assault in the first degree, and conspiracy to commit assault in the first, second or third degree. The defendant was again brought to plea on September 1, 1992;

[8] Practice Book § 623 provides: "If the trial has not commenced, the prosecuting authority may amend the information, or add additional counts, or file a substitute information. Upon motion of the defendant, the judicial authority, in his discretion, may strike the amendment or added counts or substitute information, if the trial or the cause would be unduly delayed or the substantive rights of the defendant would be prejudiced."

he pleaded not guilty to each of the counts in the substitute information. This information was read to the jury at the commencement of trial.

The final substitute information was filed on September 21, 1992, the day the jury began its deliberations. See Practice Book § 624.[9] The first three counts of this information were the same as those in the information read to the jury. The final information differed in only two respects: (1) the language "thereby caused physical injury to Michael Epps" was deleted from the count alleging attempted assault in the first degree; and (2) on the charge of conspiracy to commit assault, the state deleted references to assault in the second and third degree, leaving assault in the first degree as the only underlying predicate crime.

The defendant did not object to the filing of any of the informations, nor did he request a bill of particulars to clarify the charges against him. The defendant's present claim was not, therefore, submitted to the trial court for its determination. Ordinarily, we will not review a claim that was not distinctly raised before the trial court. Practice Book § 4185; *State* v. *Reddick*, 33 Conn. App. 311, 331, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994). In addition, the defendant has failed to raise a claim of entitlement to the extraordinary review provided by *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). In the absence of such a request, we have, in the past, declined to review a defendant's claim under similar circumstances. *State* v. *Hermann*, 38 Conn. App. 56, 65, 658 A.2d 148 (1995); *State* v. *Carter*, 34 Conn. App. 58, 91–92, 640 A.2d 610

[9] Practice Book § 624 provides: "After commencement of the trial for good cause shown, the judicial authority may permit the prosecuting authority to amend the information or indictment at any time before a verdict or finding if no additional or different offense is charged and no substantive rights of the defendant would be prejudiced. An amendment may charge an additional or different offense with the express consent of the defendant."

(1994), rev'd on other grounds, 232 Conn. 537, 656 A.2d 657 (1995); *State* v. *Johnson*, 26 Conn. App. 433, 438, 602 A.2d 36, cert. denied, 221 Conn. 916, 603 A.2d 747 (1992); but see *State* v. *Roy*, 233 Conn. 211, 658 A.2d 566 (1995).[10] We, therefore, decline to review the defendant's claim.

If we were to review the defendant's claim, however, it would fail. "The sixth amendment to the United States constitution[11] and article first, § 8 of the Connecticut constitution[12] guarantee a criminal defendant the right to be informed of the nature and cause of the charges against him with sufficient precision to enable him to meet them at trial." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 381, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989), quoting *State* v. *Laracuente*, 205 Conn. 515, 518, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d

_____

[10] In *State* v. *Roy*, supra, 233 Conn. 212, our Supreme Court held that review of the defendant's unpreserved claim of constitutional error and failure to seek a review under the principles of *State* v. *Golding*, supra, 213 Conn. 233, should not have prevented the Appellate Court from reviewing the defendant's challenge to the sufficiency of the evidence for his conviction. The decision notes that "[i]n the circumstances of this case," the merits of the defendant's challenge should have been reviewed. *State* v. *Roy*, supra, 212. It is not certain, therefore, whether the principle of *Roy* applies to all alleged constitutional deprivations or only those that relate to a claim that the evidence was insufficient to convince a trier that every element of an offense has been proven beyond a reasonable doubt. We interpret the words "[i]n the circumstances of this case" to refer to unpreserved sufficiency claims and not to the particular factual situation presented in *Roy*. We thus follow established precedent for standards of reviewability of all unpreserved claims other than those alleging insufficient evidence to support a conviction.

[11] The sixth amendment to the United States constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."

[12] The constitution of Connecticut, article first, § 8, provides in pertinent part: "In all criminal prosecutions, the accused shall have a right . . . to be informed of the nature and cause of the accusation . . . ."

913 (1988). This constitutional mandate is satisfied "[w]hen the state's pleadings have informed the defendant of the charge[s] against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and [are] definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense . . . ." (Internal quotation marks omitted.) *State* v. *Spigarolo,* supra, 381–82. It is enough for the state to set forth the statutory designation of the crimes charged, "leaving to the defendant the burden of moving for a bill of particulars where [he] wishes greater detail regarding the manner in which [those crimes were alleged to have been committed]." *State* v. *Nita,* 27 Conn. App. 103, 117, 604 A.2d 1322, cert. denied, 222 Conn. 903, 606 A.2d 1329, cert. denied, 506 U.S. 844, 113 S. Ct. 133, 121 L. Ed. 2d 86 (1992), citing *State* v. *Spigarolo,* supra, 382; see also Practice Book §§ 618 and 830 through 833.

In order to establish a violation of the right to fair notice, a defendant must show not only that the information was insufficient, but also that he was in fact prejudiced in his defense on the merits and that a substantial injustice was done because of the lack of specificity in the pleadings. *State* v. *Spigarolo,* supra, 210 Conn. 382; *State* v. *Laracuente,* supra, 205 Conn. 518–21; *State* v. *Mancinone,* 15 Conn. App. 251, 258, 545 A.2d 1131, cert. denied, 209 Conn. 818, 551 A.2d 757 (1988), cert. denied, 489 U.S. 1017, 109 S. Ct. 1132, 103 L. Ed. 2d 194 (1989). "Such a showing amounting to a deprivation of his constitutional right to adequate notice of the charges against him is not made, however, merely by establishing that the presentation of his . . . defense may be more burdensome and difficult." (Internal quotation marks omitted.) *State* v. *Mancinone,* supra, 258.

Here, the defendant has failed to show that the informations were insufficient or that he was prejudiced in any way in the preparation of his defense. The state provided the defendant with specific allegations concerning the date, time, place, victim and nature of each offense charged against him as well as the statutory names of the crimes. Although the final information was filed at the conclusion of trial, the defendant made no objection to its acceptance and the changes far from prejudiced the defendant as it did not add any charges that had not previously been made. See Practice Book § 624. The final information eliminated two crimes from the consideration of the jury as to the predicate offense of conspiracy and removed from the count charging attempted assault in the first degree the allegation that the defendant caused physical injury to Epps. Each information was sufficiently specific to notify the defendant of the charges against him and allowed him adequate notice for the preparation of his defense. See *State* v. *Spigarolo*, supra, 210 Conn. 381. Any confusion caused by these minor changes was minimal and cannot support the defendant's claim that he was deprived of fair notice. See *State* v. *Mancinone*, supra, 15 Conn. App. 258. "Because the defendant permitted the filing of the [final] amended information without objection and acquiesced in the proceedings, it necessarily follows that the prophylactic purpose of the rule to require adequate notice has been fulfilled." *State* v. *Dukes*, 29 Conn. App. 409, 420, 616 A.2d 800 (1992), cert. denied, 224 Conn. 928, 619 A.2d 851 (1993).

## II

The defendant next asserts that the evidence was insufficient to sustain his conviction of the crime of aiding and abetting sexual assault in the first degree in violation of §§ 53a-70 (a) (1) and 53a-8. The defendant claims that the evidence portrays him as only a passive bystander and posits that the evidence cannot sup-

port a finding that he intentionally aided another to commit the crime of sexual assault in the first degree.[13] We are not persuaded.

"We begin our analysis by restating the principles that guide and define the scope of our review. When called on to review a challenge to the sufficiency of the evidence to support a conviction, we undertake a two part analysis. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Haggood*, 36 Conn. App. 753, 760, 653 A.2d 216 (1995).

"The issue of the intent of the defendant is one of fact to be resolved by the jury. . . . It is the right and duty of the jurors to draw all reasonable and logical inferences from the facts as they find them to exist. . . . The jury has the further duty of determining the credibility of the witnesses and weighing the effects of conflicting evidence." (Citations omitted.) *State* v. *Patterson*, 35 Conn. App. 405, 413, 646 A.2d 258, cert. denied, 231 Conn. 930, 649 A.2d 254 (1994). "We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

---

[13] We note that this claim was properly preserved for our review because the defendant made a motion to the trial court for a judgment of acquittal based on a lack of sufficient evidence to support a conviction.

Moreover, in considering the evidence before it, "[j]uries are not required to leave common sense at the courtroom door"; *State* v. *Maxwell*, 29 Conn. App. 704, 710, 618 A.2d 43 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287, cert. denied, 509 U.S. 930, 113 S. Ct. 3057, 125 L. Ed. 2d 740 (1993); see *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985); nor are they "expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Little*, 194 Conn. 665, 674, 485 A.2d 913 (1984). Thus, "[i]f evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." *State* v. *Smith*, 138 Conn. 196, 200, 82 A.2d 816 (1951); *State* v. *Rivera*, 32 Conn. App. 193, 202, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993).

Applying these principles, we conclude that the evidence was sufficient to permit the jury to find the defendant guilty of aiding and abetting the commission of sexual assault in the first degree. Although the defendant did not directly perform or have performed on him sexual acts, the evidence is clear that he aided and abetted the other men to engage in illegal acts of sexual misconduct. "The statute creating accessorial liability requires proof that a person, acting with the mental state required for the commission of an offense, intentionally aided another person to engage in unlawful conduct. General Statutes § 53a-8. If the person has so acted, he may be prosecuted and punished as a principal." *State* v. *Haggood*, supra, 36 Conn. App. 762. "When a defendant is charged as an accessory, the state must prove criminality of intent and community of unlawful purpose. . . . The accessory statute,

§ 53a-8, sets forth the element of intent as a twofold requirement: that the accessory have the intent to *aid* the principal *and* that in so aiding he intend to *commit* the offense with which he is charged." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wideman,* 36 Conn. App. 190, 202–203, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995); see also *State* v. *Harrison,* 178 Conn. 689, 694, 425 A.2d 111 (1979); *State* v. *Teart,* 170 Conn. 332, 336, 365 A.2d 1200 (1976).

The evidence established that the defendant was not an innocent bystander as he claims to have been. He shared the requisite criminality of intent and community of unlawful purpose of his companions. The defendant was a member of the group of men that accosted the victim at the gate of building seventeen. At the gate, the defendant was present when the victim was threatened to choose between being beaten and performing fellatio on the entire group. The defendant remained with the group as they forced the victim to go with them to building thirteen. The defendant walked behind the victim to her left. While the victim was being moved to building thirteen by the defendant and the others, she knew that no one would come to her aid if she decided to flee. She was fearful and compliant because she had seen her captors, including the defendant, severely beat and kick people.

When the group arrived at building thirteen, the defendant provided the key to unlock the door to an apartment where he had been staying. Inside the apartment, the defendant was one of four persons who indicated that he would not be satisfied with oral sex, but that he desired vaginal intercourse with the victim. One of the assailants was sent out to get condoms for that purpose.

When the victim was forced to perform fellatio on members of the group, the defendant was present and stood by drinking beer and cheering on the others. The defendant and others were laughing and telling the victim to "do it right or she wouldn't know what happened to her." At one point, McNeil began striking the victim on the buttocks with his belt. The defendant admonished McNeil for not knowing how to beat the victim, took the belt away from McNeil and demonstrated for him the proper way to employ the belt. McNeil retrieved the belt from the defendant and continued to beat the victim.

The defendant's claim that the evidence was insufficient to support his conviction is meritless.

### III

The defendant next asserts that the trial court improperly refused to permit him to ask a witness, W, about the content of W's testimony at W's criminal trial on charges arising out of this incident.

Certain additional facts are necessary for an understanding of our resolution of this claim. On September 9, 1992, the state filed a motion in limine to preclude the defendant from asking questions "regarding, or in any way informing the jury of the not guilty verdict in *State* v. [*W*], as such verdict is irrelevant." The motion was argued on September 18, 1992, prior to the defendant offering W as a witness. The trial court granted the state's motion over the objection of the defendant's that the evidence was relevant.[14] The defendant then asked if he would be able to elicit from W on direct examination the content of his testimony

---

[14] We note that the defendant raises no claim with respect to the propriety of the trial court's decision to exclude testimony concerning W's acquittal. The defendant's claim is limited to whether the trial court properly prohibited him from eliciting from W the content of his testimony at his prior trial.

in his prior criminal trial. The trial court stated that the defendant would be able to call W as a witness, but that evidence concerning his testimony at the prior trial would be inadmissible hearsay. The defendant made no attempt to invoke any exceptions to the hearsay rule in order to support a claim of admissibility, but only requested an exception to the trial court's ruling.

The defendant on appeal now claims that W's testimony was admissible under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86 (1986), or alternately under *State* v. *Dolphin*, 178 Conn. 564, 525 A.2d 509 (1979). Neither of these claims were made to the trial court. "Appellate review of evidentiary rulings is ordinarily limited to the specific legal issue raised by the objection of trial counsel. See *State* v. *Rothenberg*, 195 Conn. 253, 263, 487 A.2d 545 (1985). The purpose of requiring trial counsel to object properly is not merely formal: it serves to alert the trial court to purported error while there is time to correct it without ordering a retrial. Id. . . . We have not yet reached a jurisprudential stage where we require trial judges to be mentally telepathic." (Citations omitted; internal quotation marks omitted.) *State* v. *Harrison*, 34 Conn. App. 473, 482, 642 A.2d 36, cert. denied, 231 Conn. 907, 648 A.2d 157 (1994). We have, therefore, consistently declined to review claims based on a ground different from that raised in the trial court; *State* v. *Ulen*, 31 Conn. App. 20, 29, 623 A.2d 70, cert. denied, 226 Conn. 905, 625 A.2d 1378 (1993); or where the claim has not been raised before the trial court in the first instance. *State* v. *Harrison*, supra, 483. "This court will not review issues of law that are raised for the first time on appeal." *State* v. *Harvey*, 27 Conn. App. 171, 186, 605 A.2d 563, cert. denied, 222 Conn. 907, 608 A.2d 693 (1992); see also *State* v. *Robinson*, 227 Conn. 711, 741, 631 A.2d 288 (1993).

Even if the defendant had raised his claims before the trial court, however, the trial court's ruling would

not be reversed on appeal. "Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if it could not reasonably conclude as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Leonard*, 31 Conn. App. 178, 190, 623 A.2d 1052, cert. granted, 226 Conn. 912, 628 A.2d 985 (1993), appeal withdrawn January 7, 1994.

The defendant has failed to show either that the trial court's ruling was incorrect or that he was prejudiced by its ruling in any way. W had not yet testified at the time of the trial court's ruling and it was impossible to determine whether W's testimony might become relevant under *State* v. *Whelan*, supra, 200 Conn. 743, which provides an exception to the hearsay rule for prior written and signed inconsistent statements of a witness for substantive purposes, or under *State* v. *Dolphin*, supra, 178 Conn. 564, which allows the admission in certain circumstances of prior consistent statements to bolster the credibility of a witness who has been impeached. The defendant cannot, therefore, establish that the trial court abused its discretion or that he was prejudiced by its ruling and cannot prevail on his claim.

The claim of the defendant that the trial court improperly excluded the prior testimony of W must, therefore, fail.

IV

The defendant next asserts that the state withheld exculpatory evidence in violation of *Brady* v. *Maryland*,

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and General Statutes § 54-86c.[15] We disagree.

The following additional facts are necessary for the resolution of this claim. During discovery, the defendant requested disclosure of all exculpatory evidence in the possession of the state. On September 17, 1992, the defendant informed the trial court that the state had obtained the transcript of the criminal trial against W and argued that the state's possession of that transcript deprived him of a fair trial. The trial court stated that the defendant's objection was premature as W had not yet been called as a witness.

On September 18, 1992, the trial court granted the state's motion in limine to exclude evidence of W's acquittal. The defendant again brought up the issue of the state's possession of the transcript of W's trial and claimed that because the state had a transcript that the defendant did not have, the state had an unfair advantage over the defendant in the preparation of its case.[16]

---

[15] General Statutes § 54-86c (a) provides: "Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor. If prior to or during the trial of the case, the prosecutorial official discovers additional information or material which is exculpatory, he shall promptly disclose the information or material to the defendant."

[16] During argument, the defendant also claimed that the state had obtained the transcript in violation of General Statutes § 54-142a which provides for the erasure of records after a finding of not guilty. The state informed the court that § 54-142a does not mandate the erasure of records until the expiration of time for appeal and that it obtained the transcript before that time had elapsed. The state added that the defendant had equal access to the transcript during that time period, but neglected to request it. In response, the defendant argued that regardless of the time that the records were erased, the state was entitled to them only in the limited circumstances outlined in § 54-142a (f). The defendant has made no claim on appeal that the records were obtained in violation of the erasure statute, General Statutes § 54-142a.

The state argued that having the transcript did not provide it with an advantage because the same state's attorney prosecuted W and was present to hear W's testimony. The trial court overruled the defendant's objection, stating that the transcript would only be of use to the state if W was called as a witness and perjured himself or if W's testimony was inconsistent with that at the prior trial. The trial court concluded, therefore, that the transcript did not confer a benefit to the state. Subsequently, W testified as a witness for the defendant without reference to his testimony at the prior trial or to the transcript of his prior testimony.

The defendant now claims that the state was obligated to disclose W's transcript under *Brady* v. *Maryland*, supra, 373 U.S. 83, and General Statutes § 54-86c. Under *Brady*, "[t]he state is constitutionally obligated to disclose certain information to a defendant. The principles of due process require the prosecution to disclose exculpatory evidence that is material to a defendant's guilt or punishment. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Citations omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 90, 621 A.2d 728 (1993).

Here, the defendant has failed to establish any of these requirements. First, the evidence cannot be considered to have been suppressed. Although the defendant did make a discovery request for exculpatory evidence, the defendant was aware of the existence of the transcript of W's testimony prior to his being called as a witness. "Evidence known to the defendant or his counsel, or that is disclosed, even during trial, is not considered suppressed as that term is used in *Brady*." (Internal quotation marks omitted.) Id., 91, citing *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990),

and *State* v. *Dolphin*, 195 Conn. 444, 455–56, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985). Second, the defendant has not satisfied the final two requirements; he has failed to establish that the evidence was favorable and material. The defendant never requested an in camera examination of the transcript in order for the trial court to determine whether the material contained therein was exculpatory to the defendant, nor did he request the court to make the transcript an exhibit for identification for appeal purposes for our review. See *State* v. *Harrison*, supra, 34 Conn. App. 490.

In addition, § 54-86c requires the disclosure only of exculpatory evidence. The defendant's failure to establish the exculpatory nature of the evidence precludes his claims under that statute as well.

## V

Finally, the defendant asserts that the trial court improperly denied his motion for judgment of acquittal as to the charges of conspiracy. In support of this claim, the defendant asserts that W's acquittal constituted a bar against the prosecution of the remainder of the alleged coconspirators.

In his motion for judgment of acquittal, the defendant alleged only that the evidence did not reasonably permit a finding of guilty beyond a reasonable doubt.[17] The claim presently advanced by the defendant that the acquittal of one claimed coconspirator constitutes a bar to the prosecution of the others, was not, therefore, raised before the trial court. In addition, the defendant has failed to raise a claim of constitutional violation for which he could seek review under *State*

---

[17] We note that the defendant does not assert on appeal a claim that the trial court improperly denied his motion for judgment of acquittal of the conspiracy charges based on the sufficiency of the evidence.

v. *Golding,* supra, 213 Conn. 233. We, therefore, decline to review this unpreserved claim.[18] See *State* v. *Hermann,* supra, 38 Conn. App. 65; *State* v. *Carter,* supra, 34 Conn. App. 91–92; *State* v. *Johnson,* supra, 26 Conn. App. 438; but see *State* v. *Roy,* 233 Conn. 211.

If we were to review the defendant's claim, however, it would fail. Under our law, the acquittal of a sole alleged coconspirator effectuates a bar against the prosecution of the remaining conspirator. *State* v. *Robinson,* 213 Conn. 243, 253, 567 A.2d 1173 (1989). This principle stems from the fact that our conspiracy statute; General Statutes § 53a-48; "is bilateral in nature . . . [and] requires a showing that two or more coconspirators intended to engage in or cause conduct that constitutes a crime." (Internal quotation marks omitted.) *State* v. *Robinson,* supra, 250, quoting *State* v. *Grullon,* 212 Conn. 195, 199, 562 A.2d 481 (1989). The principle applies, however, only where the claim is that all of the defendant's alleged coconspirators have been acquitted. Otherwise, the state is not barred from prosecuting the defendant on a charge of conspiracy. *State* v. *Robinson,* supra, 253.

Here, the state alleged that the defendant "agreed with one or more persons to engage in or cause the performance of such conduct [as would constitute a crime]." In its charge to the jury, the trial court, therefore, did not limit the actors in the conspiracy to the defendant and W. The defendant did not except to the charge. Moreover, the evidence was clear that many more persons than two were actively involved in the conspiracy. Thus, the acquittal of only one of the group of alleged coconspirators does not mandate the defendant's acquittal.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[18] See footnote 10.