# STATE OF CONNECTICUT *v.* MELVIN JONES
## (AC 18050)

Lavery, Spear and Sullivan, Js.

Argued June 1—officially released September 15, 1998

*Melvin Jones,* pro se, the appellant (defendant).

*Judith Rossi,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *James G. Clark,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Melvin Jones, appeals from the judgment of conviction, rendered after a jury trial, of capital felony in violation of General Statutes § 53a-54b (3)[1] and carrying a pistol without a permit in violation of General Statutes § 29-35.[2] On appeal, the

---

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (3) murder committed by one who has previously been convicted of intentional murder or of murder committed in the course of commission of a felony . . . ."

[2] General Statutes § 29-35 (a) provides: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying

defendant claims that (1) the trial court improperly permitted the state to refer to the previous proceedings and his conviction in his first trial, (2) the trial court improperly denied his motion in limine in which he sought to preclude the state from offering into evidence · the testimony of Frankie Harris and the camouflage jacket she retrieved from a dumpster, (3) the state's failure to preserve the jacket seized from the defendant at the time of his arrest violated his state and federal constitutional rights to due process of law and confrontation, (4) there was insufficient evidence to support the conviction and (5) the trial court improperly commented on the evidence in responding to a written interrogatory posed by the jury.

The defendant appealed to this court from a judgment of conviction from his second trial. In the first proceeding, the case was tried to the jury before *Hadden, J.*, and the defendant was convicted of capital felony in violation of § 53a-54b (3) and carrying a pistol without a permit in violation of § 29-35. The defendant appealed to our Supreme Court. While that appeal was pending, the defendant filed a petition for a new trial, which the trial court, *Booth, J.*, granted. The Supreme Court then considered the defendant's appeal, and reversed the judgment of conviction and remanded the case for a new trial. See *State* v. *Jones*, 234 Conn. 324, 662 A.2d 1199 (1995). The defendant was tried to a jury for a

---

any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33."

second time before *Fracasse, J.*, and convicted of capital felony and carrying a pistol without a permit.[3] He was sentenced to life imprisonment without the possibility of parole. This appeal followed. We affirm the judgment of conviction.

The jury reasonably could have found the following facts. On the morning of October 17, 1990, Bonaventure Console, who resided at 365 Howard Avenue, New Haven, saw the defendant walking toward an automobile parked across the street from his home. A white male, later identified as the victim, Wayne Curtis, was seated in the front of the vehicle. Console had frequently seen the defendant in that neighborhood and later that same day, described him to the police as a black male with braided hair who always wore camouflage clothing.

Shortly thereafter, Nilda Mercado, an eleven year old girl, passed the victim's vehicle on her way to school. Mercado witnessed a black male banging the head of a white male, who was seated in the vehicle, against the car door. As she walked past the car, Mercado heard two gunshots fired. Immediately after the incident, Mercado informed her aunt that the black man had braids in his hair and wore camouflage clothing. Although Mercado could not make a positive in-court identification, she testified that the defendant had similar braids and the same features as the perpetrator.

Angel Delgado, a seventeen year old boy who lived on Howard Avenue, was looking out a second story window of his home at approximately 7:15 a.m. on October 17, 1990, when he witnessed the defendant and the

---

[3] At the conclusion of the first stage of the proceedings on the capital felony count, the jury found the defendant guilty of murder. At the guilt phase of the proceedings on the capital felony count, the state introduced evidence that the defendant had been convicted of murder in 1976, and the defendant was convicted of capital felony.

victim across the street. The victim was seated in a vehicle and the two men were arguing. Although Delgado saw only the side of the defendant's face, and his view may have been somewhat obscured by a tree, he recognized the defendant as someone he frequently had seen around that neighborhood during the weeks preceding the homicide. Delgado looked away for a moment and then heard gunshots. When he looked back, the defendant was gone and the victim was lying in the driver's seat. Delgado saw a young girl, later identified as Mercado, running down Howard Avenue. He also described the defendant as having braids and wearing camouflage clothing.

Harris, who also knew the defendant from that neighborhood, heard the shots and moments later saw the defendant run toward her, remove a camouflage jacket and throw it in a nearby dumpster. She retrieved the jacket, which contained a work order from a service station for a wheel alignment performed on the victim's car. Harris admitted that she was a drug addict and a police informant. Harris testified, however, that at the time of the murder, she had not ingested any drugs and, at the time she spoke to the police, she was informed that she would not be paid for her information in connection with this case.

Larry Hodge, also a narcotics user and police informant, first met the victim at a gas station on Route 80 in New Haven at 3 a.m. on October 17, 1990. Hodge paid the victim for a ride to Anastasio's truck stop in New Haven. After Hodge exited the vehicle and began to walk away, he saw a black male with braided hair approach the victim and get into the vehicle. After learning of the victim's death, Hodge, out of concern that his fingerprints in the automobile would be identified in the homicide investigation, contacted the police. In his interview with the police, Hodge gave a sworn statement identifying the defendant from a photographic

array as the man he had seen get into the victim's car. Hodge later retracted that identification before the jury. There was evidence that Hodge retracted the identification because he feared retaliation by people who had pressured him not to testify in the trial.

Officer Brendan Cannon of the New Haven police department arrested the defendant on October 19, 1990. At the time of his arrest, the defendant had four braids and was wearing a size extra small camouflage jacket. There was evidence that this jacket was too small for the defendant. The camouflage jacket Harris retrieved from the dumpster was size large.

Arkady Katznelson, an assistant state medical examiner, testified that the victim had died from loss of blood as a result of being shot in the abdomen at close range and that he had suffered facial bruises consistent with having had his head slammed against the armrest of the car door. A second bullet was recovered from the driver's side door.

I

The defendant first claims that the trial court improperly permitted the state to disclose, on several occasions in the presence of the jury, that there had been prior proceedings and that the defendant had been convicted in the first trial.

On February 26, 1996, the trial court granted the state's motion in limine, precluding both parties from referring to the outcome of the prior proceedings. Defense counsel recognized, however, that it might be necessary to refer to testimony from the prior proceedings, and the trial court granted the motion with the understanding that the parties would inform the court when and if the need to refer to the prior conviction arose.[4]

---

[4] The trial court and defense counsel engaged in the following colloquy concerning the extent to which reference could be made to the prior proceedings:

## A

Reference to the prior proceedings first occurred during the state's redirect examination of Console. Console testified for the state that he saw the defendant in close proximity to the victim's car shortly before the homicide. At the conclusion of Console's direct testimony, defense counsel informed the court that on cross-examination he intended to discuss Console's criminal record in an effort to impeach Console's credibility. Defense counsel sought to demonstrate that Console might be inclined to testify favorably for the state because he had several pending criminal charges. Out of the presence of the jury, the state requested that it be afforded an opportunity to rehabilitate Console with his prior consistent testimony from the first trial, which had taken place before Console incurred any of the pending criminal charges. The trial court ruled that "[t]o the extent

"The Court: . . . And the state's motion in limine—call it prior trials, that will be marked as court file number 149. Have you had a chance to look at that Mr. Jones [the defendant]?

"[Defense Counsel]: Your Honor, I've spoken to Mr. Jones about the issue, particularly regarding the motion eliminating reference to the prior trials, and I think that certainly we can agree that there be no specific mention made of the outcomes in those proceedings or even the nature of the proceedings. The only caveat I would have at this juncture is that if it becomes necessary to refer to transcripts of the prior proceedings for some reason, which certainly is a possibility, that is, if there are some statements made that obviously we're going to have to get into the fact that there was some sort of prior sworn testimony.

"The Court: Well, this motion is only directed, prohibiting any reference to the outcome of the previous criminal trial in this case.

"[Defense Counsel]: Right.

"The Court: Or to the court's decision in the petition for new trial.

"[Defense Counsel]: We don't have any objection to that, Your Honor.

"The Court: No, obviously if the witness is going to testify in this trial who had previously testified, there might be some reason to make reference to the prior testimony.

"[Defense Counsel]: Exactly.

"The Court: But beyond that, if there is any need to make an inquiry, then prior to any question's being posed, the matter should be brought up before the court."

the testimony [Console] gives here is consistent with the testimony he gave in the first trial, [the prior testimony] is admissible as a prior consistent statement [made] prior to these arrests." The defendant took an exception to the trial court's ruling.

Thereafter, defense counsel impeached Console with his criminal record. On redirect examination, the state offered a transcript of Console's testimony from the first trial as a prior consistent statement to refute the suggestion that his current testimony was influenced by bias or interest. Defense counsel did not take an exception to the state's offer of evidence. Immediately after the state read Console's prior testimony into the record, the trial court gave a limiting instruction to the jury.[5]

The defendant's claim is an evidentiary one. "[T]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. *State* v. *Bruno*, 236 Conn. 514, 549, 673 A.2d 1117 (1996)." (Internal quotation marks omitted.) *State* v. *Williams*, 48 Conn. App. 361, 366, 709 A.2d 43, cert. denied, 245 Conn. 907, 718 A.2d 16 (1998).

As a general rule, a witness' prior consistent statement is inadmissible at trial. *State* v. *Pollitt*, 205 Conn.

---

[5] The trial court instructed the jury: "Now, ladies and gentlemen, with respect to the testimony which has just been read to you, that is the testimony from Mr. Console from the first trial. It has been obviously read to you so that you may consider it. However, in considering it, you are to bear in mind that testimony of Mr. Console in the first trial is not evidence of the facts contained in it. It is offered to you to consider only in weighing the credibility of Mr. Console's testimony here in front of you today. If you find that the testimony of Console in the first trial is consistent with his testimony before you, you may give it such weight [as] you decide it warrants in evaluating Mr. Console's credibility and his testimony here before you here today. So that is the sole purpose of that evidence of Mr. Console's testimony in the first trial. I will address that again in my charge to you at the conclusion of this case, but I did it now so that it's fresh in your mind, having had that read to you."

61, 76, 530 A.2d 155 (1987); *State* v. *Anonymous (83-FG)*, 190 Conn. 715, 728, 463 A.2d 533 (1983). "This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached by . . . the suggestion of bias, motive, or interest arising after the time the prior consistent statement was made . . . ." (Citation omitted.) *State* v. *Valentine*, 240 Conn. 395, 413, 692 A.2d 727 (1997); *State* v. *Brown*, 187 Conn. 602, 608, 447 A.2d 734 (1982); *State* v. *Dolphin*, 178 Conn. 564, 571–72, 424 A.2d 266 (1979).

Defense counsel attempted to impeach Console with his criminal record in an effort to suggest that Console's direct testimony reflected his bias and interest in obtaining favorable treatment for his pending criminal charges. The trial court did not abuse its discretion by allowing the state to rehabilitate Console's testimony with his prior consistent statements from the first trial. In addition, the trial court minimized any potential for juror confusion with a limiting instruction.

Thereafter, the state referred to the prior proceedings in its direct examination of Hodge, Harris, Delgado, Detective Leroy Dease, Detective Vaughn Maher and Michael Pepper. Defense counsel did not, however, object in any of these instances.

It is well established that generally this court will not review claims that were not properly preserved in the trial court. *State* v. *Nardini*, 187 Conn. 513, 516–17, 447 A.2d 396 (1982); *State* v. *Kurvin*, 186 Conn. 555, 563–64, 442 A.2d 1327 (1982); *State* v. *Rogers*, 38 Conn. App. 777, 787, 664 A.2d 291, cert. denied, 235 Conn. 918, 665 A.2d 610 (1995), cert denied, 516 U.S. 1084, 116 S. Ct. 799, 133 L. Ed. 2d 747 (1996). A defendant may prevail on a claim of constitutional error not preserved at trial, however, if the defendant satisfies the four part standard set forth in *State* v. *Golding*, 213 Conn. 233, 239–40,

567 A.2d 823 (1989). The defendant has not requested that we review these unpreserved claims under *Golding*. "In the absence of such a request, we have, in the past, declined to review a defendant's claim under similar circumstances." *State* v. *Rogers*, supra, 787. We therefore decline to review the defendant's unpreserved claims.

B

The defendant next claims that the trial court improperly allowed the state, in its cross-examination of Pasquale DeMaio, a defense witness, to disclose that the defendant had been convicted in the first trial. The defendant claims that the state's reference to his prior conviction constituted harmful error.

On direct examination, DeMaio testified that on the morning of October 17, 1990, he was painting a house located at 358-60 Howard Avenue. When he was interviewed by the police later that day and on another occasion shortly thereafter, he informed the police that he did not witness the homicide. DeMaio testified that he feared getting involved and, therefore, he did not disclose any information to the police on those two occasions. In 1993, DeMaio contacted the authorities and informed them that he had witnessed the homicide and that the defendant was not the perpetrator. DeMaio testified that he contacted the police because he was no longer fearful of testifying. He also admitted that he came forward after the defendant's friends, Frank LoSacco and Emma Jones, had contacted him.

On cross-examination, the state asked DeMaio why LoSacco had contacted him and whether LoSacco had mentioned anything that may have encouraged DeMaio to contact the police. The state then asked DeMaio if LoSacco had stated that the defendant "had been improperly convicted." Defense counsel objected to this question, and the trial court sustained the objection.

The jury was then excused and, after argument, the trial court ruled that the state could resume its prior line of inquiry because this information was relevant in ascertaining what motivated DeMaio to contact the authorities with new information approximately three years after the homicide. The trial court gave a limiting instruction before the state resumed its cross-examination of DeMaio, instructing the jury that it should not draw any unfavorable inferences against the defendant because there had been prior proceedings and a conviction.[6] On cross-examination, DeMaio admitted that both LoSacco and Emma Jones had informed him that the defendant was wrongly convicted, and that the state's witnesses were drug addicts and paid informants. The state inquired whether those statements from Emma Jones and LoSacco, or other factors, motivated DeMaio to contact the authorities. At the conclusion of the trial, the trial court repeated the limiting instruction, informing the jury that the prior proceedings are not evidence and that they should not draw any adverse inferences against the defendant.[7]

[6] On March 18, 1996, the trial court instructed the jury: "Ladies and gentlemen, you have heard from time to time during this trial references to prior proceedings and prior trials, and in this line of inquiry that area will be brought up again. And I just point out to you now to keep in mind that there are references in testimony to prior proceedings in prior trials. That is not totally unusual to occur. The fact that there have been prior proceedings and prior trials, they are not relevant to your considerations either, but what those were about or what results were, so the fact that there were prior proceedings and prior trials is a matter that you should put out of your minds during your deliberations, and because there had been prior proceedings and trials, you must not use that information in any way and you must not draw any inference unfavorable to the defendant because there have been prior proceedings and prior trials. Just clearly put that out of your minds during your deliberations just as you put out of your minds the fact that if in this case the defendant doesn't testify, you must not draw any inference unfavorable to him because he has chosen not to testify. In that same manner, you do not draw any inference unfavorable for the defendant because there had been prior proceedings in a prior trial."

[7] On March 21, 1996, the trial court instructed the jury: "The fact that there have been prior proceedings in a prior trial also is not evidence. You

The scope of cross-examination in a criminal trial is a matter properly left to the sound discretion of the trial court. *State* v. *Ghere,* 201 Conn. 289, 303, 513 A.2d 1226 (1986). Generally, evidence is admissible when it tends to establish a fact in issue or corroborates other direct evidence in the case. Id. *State* v. *McClendon,* 199 Conn. 5, 8, 505 A.2d 685 (1986). Therefore, "if evidence adduced on cross-examination conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should be admitted." *State* v. *Briggs,* 179 Conn. 328, 332, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980).

DeMaio's credibility was properly in issue, and it was permissible for the state to explore on cross-examination whether the defendant's friends, LoSacco and Emma Jones, motivated DeMaio to contact the police. "[E]vidence tending to show a substantial reason for bias or interest in an important witness is never collateral or irrelevant. It may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) *State* v. *Milum,* 197 Conn. 602, 610, 500 A.2d 555 (1985). Accordingly, the trial court did not abuse its discretion in allowing the state to refer to the defendant's prior conviction in its cross-examination of DeMaio. In addition, the trial court minimized any potential for juror confusion by instructing the jury that it should not draw any adverse inferences against the defendant because there were prior proceedings. Before the state resumed its cross-examination of DeMaio, the trial court specifically

---

must not—you must put that out of your minds during your deliberations and not speculate about it. You must not draw any inference unfavorable to the defendant because there have been prior proceedings in a prior trial. Put that out of your minds during your deliberations just as you put out of your minds the fact that the defendant did not testify. You must not draw any inference unfavorable to the defendant because there had been a prior proceeding."

instructed the jurors to ignore the *results* of any prior proceedings. "It is to be presumed that the jury followed the court's instructions unless the contrary appears." *State* v. *Rouleau*, 204 Conn. 240, 254, 528 A.2d 343 (1987).

## II

The defendant's second claim is that the trial court improperly denied his motion in limine in which he sought to preclude the state from offering into evidence the testimony of Harris and the camouflage jacket she had retrieved from a dumpster. Specifically, the defendant contends that the trial court (1) should have taken judicial notice that Harris found the jacket prior to the day of the murder, (2) improperly admitted testimony from Harris and Detective Leroy Dease concerning the date on which Harris found the jacket and turned it over to the authorities and (3) failed to hold a hearing to decide the motion in limine.

## A

The defendant first claims that the trial court should have taken judicial notice that Harris retrieved the camouflage jacket from a dumpster between one and three days prior to the October 17, 1990 murder. The defendant's request for judicial notice is predicated on the following. At the probable cause hearing on December 14, 1990, Harris testified that she had the jacket for three days before she turned it over to the police. On July 20, 1992, during the first trial, Harris testified that she found the jacket one day before turning it over to the police. Moreover, the evidence tag on the jacket, which was filled out by Dease, was dated October 15, 1990, two days before the murder.

At trial, however, the state offered evidence that Harris found the jacket on October 17, 1990. Dease testified that he entered an incorrect date on the evidence tag

for the jacket. Detective Gil Burton testified that he received this jacket from Harris on October 17, 1990, and he promptly turned the jacket over to Dease. Dease testified that he interviewed Harris on October 17, 1990, and that during the interview, she stated that she had found the jacket earlier that morning. Harris testified that because of her drug addiction she often lost track of time and, therefore, was not certain of the exact date on which she had found the jacket. On cross-examination, defense counsel introduced Harris' prior inconsistent statements concerning when she had found the jacket.

Because this factual issue was in dispute, the trial court properly refrained from taking judicial notice of the date on which Harris found the jacket. "The true concept of what is judicially known is that it is some-thing which is already in the court's possession or, at any rate, is so accessible that it is unnecessary and therefore time wasting to require evidence of it." *State* v. *Tomanelli*, 153 Conn. 365, 368, 216 A.2d 625 (1966); *State* v. *Main*, 69 Conn. 123, 136, 37 A. 80 (1897). "[F]acts may be judicially noticed which are so notorious that the production of evidence would be unnecessary, or which the judicial function supposes the judge to be familiar with, in theory at least, or which, although they are neither notorious nor bound to be judicially known, are capable of such instant and unquestionable demon-stration, if desired, that no party would think of impos-ing a falsity on the tribunal in the face of an intelligent adversary." (Internal quotation marks omitted.) *State* v. *Tomanelli*, supra, 369. A trial court cannot use this doctrine to resolve factual ambiguities or to select one possible inference over another from the evidence. Thus, judicial notice was inappropriate and the trial court properly placed this issue before the jury, which was able to consider the discrepancies in the testimony and to determine what happened.

## B

The defendant next claims that the trial court improperly admitted testimony from Harris and Dease concerning the date on which Harris found the camouflage jacket because the state admitted, in pleadings filed in a hearing on the defendant's petition for a new trial, that Harris had obtained the jacket two days prior to the murder.[8] The defendant claims that these statements are admissible against the state because they constitute judicial admissions.

"[A] judicial admission is [a]n express waiver, made in court or preparatory to trial, by the party or his attorney, conceding for the purposes of the trial the truth of some alleged fact, has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it, and the other is not allowed to disprove it. . . . It is, in truth, a substitute for evidence, in that it does away with the need for evidence." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 180 Conn. 382, 396, 429 A.2d 919 (1980). The defendant's reliance on the doctrine of judicial admissions is misplaced. This doctrine does not apply to the state in criminal cases. Id., 395–97. "[I]n a criminal prosecution, the state is unlike a party to a civil action with respect to judicial admissions. This is so because the state is not an actor in the transaction or event giving rise to the prosecution as is a party to a civil action, but only exercises the

---

[8] In a pretrial memorandum of law dated August 31, 1994, the state claimed: "Frankie Harris also testified that she heard shots from the area of Howard and Lamberton early that morning [October 17, 1990]. . . . A short time later, she saw the defendant running away from that area and discard a camouflage jacket in a dumpster . . . . Harris retrieved the jacket hoping it contained some cocaine . . . . Two days later, she turned the jacket over to the police."

In a posttrial memorandum of law dated September 29, 1994, the state once again claimed that Harris found a camouflage jacket on October 17, 1990, and "[t]wo days later, she turned the jacket over to the police."

public's power to vindicate its criminal laws." Id., 397. Accordingly, the defendant's claim is without merit.

## C

The defendant also claims that the trial court should have held a hearing to decide the issues raised in the motion in limine. On March 11, 1996, prior to trial, the defendant filed this motion in limine. The defendant did not request that a hearing be held and, in fact, defense counsel stated: "I'd ask the court simply to take those on the papers. They involve, I guess, two witnesses that may or may not testify, and I would just ask the court when it has an opportunity to review those and just make a ruling for the record." The defendant fails to cite, nor can we find, any authority mandating that a trial court grant a hearing on a motion in limine. The defendant's claim is without merit.

## III

The defendant's third claim is that the state's loss of the camouflage jacket seized from him at the time of his arrest violated his federal and state constitutional rights to due process of law and confrontation. The state sent two camouflage jackets to the state forensic laboratory for testing: the jacket Harris retrieved from a dumpster and the jacket seized from the defendant at the time of his arrest. Both jackets tested negative for bloodstains and gunpowder residue. At trial, the state introduced into evidence the jacket found by Harris. Although the forensic laboratory returned the other jacket to the state's attorney's office, it was lost prior to the commencement of the first trial. *State* v. *Jones*, supra, 234 Conn. 328 n.3.

The defendant did not preserve these alleged claims of constitutional error at trial and now seeks review of them before this court.[9] Because these claims are raised

---

[9] The defendant has not properly preserved this claim of alleged constitutional error for appellate review. On January 10, 1996, the defendant filed

a motion for disclosure, requesting that the state produce the camouflage jacket that was seized from him at the time of his arrest. On January 11, 1996, the trial court addressed the defendant's motion:

"The Court: Now, motion 135, which is the discovery. Is there any dispute about item A? This is the jacket [seized from the defendant at the time of his arrest]. That was the matter included in the court's charge in the first trial. The jacket was not available, and therefore the jury, if [it] found it reasonable, could draw an adverse inference.

"[The Defendant]: Well, the state during the first trial, Your Honor, stated that [it] had lost the jacket and so I mention this, Your Honor, because I don't know what the state still has in its possession or if the state took responsibility for the loss of it. Or if the state later discovered it or found it or whatever.

"The Court: Well, the answer is that it is not available, which means that [the state does not] have it.

"[The Defendant]: Well, it was not available then. I don't know if it is available now.

"The Court: No, that is the response now.

"[Assistant State's Attorney]: This is the response that was given to you this morning, Mr. Jones.

"The Court: That it is not available. If, in view of this, the state happens to find it, the state's responsibility is to tell you about it promptly.

"[Assistant State's Attorney]: It will not be found.

"The Court: And Mr. Jones and counsel can work out viewing the photographs. I gather those are photographs that have already been introduced at one time during the trial.

"[Assistant State's Attorney]: Well, there were a number of photographs that were. There were a number of other photographs that were taken.

"The Court: But those are available to be viewed.

"[Assistant State's Attorney]: They are available. I have a contact sheet with me of all the photographs that were taken, and I certainly don't mind him seeing them."

Although the trial court informed the defendant that the state did not possess this jacket, the defendant did not take an exception to the state's failure to preserve this item of evidence. The defendant's motion for disclosure, without more, is insufficient to preserve this claim for review. See *State* v. *Johnson*, 29 Conn. App. 394, 396–97, 615 A.2d 512 (1992), appeal dismissed, 227 Conn. 611, 630 A.2d 69 (1993) (holding that defendant's pretrial motion for disclosure insufficient, without more, to preserve properly alleged claim of constitutional error for appellate review).

On March 14, 1996, Robert O'Brien, a criminalist for the state police forensic laboratory, testified on direct examination about tests he performed on the missing jacket. On this occasion, the defendant failed to take an exception to O'Brien's testimony concerning the missing jacket. Moreover, the defendant has not provided this court with any additional evidence that this claim of alleged constitutional error was properly preserved for review.

for the first time on appeal, our review is limited to either plain error review; see Practice Book § 60-5; or review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant has failed, however, to request review of this claim under either of those doctrines. Although this court has declined to review a defendant's claim under similar circumstances; *State* v. *Rogers*, supra, 38 Conn. App. 787; because these claims allege a violation of due process of law arising out of a trial in which the defendant was convicted of capital felony, we will consider the defendant's claims and review them under *Golding*. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two conditions are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself." (Internal quotation marks omitted.) *State* v. *Gonzalez-Rivera*, 48 Conn. App. 784, 788, 713 A.2d 847, cert. denied, 245 Conn. 923, 717 A.2d 238 (1998).

The record is adequate for review, and the defendant has alleged claims of constitutional magnitude; thus, the defendant has satisfied the first two prongs of *Golding*. Therefore, we will examine the defendant's claims to determine whether the alleged constitutional violations clearly exist and whether they deprived the defendant of a fair trial. See *State* v. *Pharr*, 44 Conn. App. 561,

568, 691 A.2d 1081 (1997); *State* v. *Daniels*, 42 Conn. App. 445, 459, 681 A.2d 337, cert. denied, 239 Conn. 928, 683 A.2d 397 (1996).

## A

The defendant claims that the state's failure to preserve the jacket he was wearing at the time of his arrest violated his right to due process of law under article first, § 8, of the constitution of Connecticut[10] and the fourteenth amendment to the United States constitution.[11] Because the record contains no evidence of bad faith on the part of the police in failing to preserve the jacket, as required under the federal standard set forth in *Arizona* v. *Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), we conclude that no violation exists under the federal constitution and focus our analysis on the defendant's state constitutional claim.

In *State* v. *Morales*, 232 Conn. 707, 727, 657 A.2d 585 (1995), our Supreme Court rejected the federal standard of *Arizona* v. *Youngblood*, supra, 488 U.S. 51, and held that under our state constitution, the good or bad faith of the police in failing to preserve potentially useful evidence is not dispositive of whether a criminal defendant has been deprived of due process of law. "Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the *Asherman* balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: [1] 'the

---

[10] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[11] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

materiality of the missing evidence, [2] the likelihood of mistaken interpretation of it by witnesses or the jury, [3] the reason for its nonavailability to the defense and [4] the prejudice to the defendant caused by the unavailability of the evidence.' *State* v. *Asherman*, [193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)]." *State* v. *Morales*, supra, 726–27.

In applying the first *Asherman* factor, we must evaluate the materiality of the lost evidence. The measure of materiality is whether there is a reasonable probability that, had the jacket been available to the defense at trial, the result of the proceeding would have been different. *State* v. *Valentine*, supra, 240 Conn. 417–18; *State* v. *Baldwin*, 224 Conn. 347, 365, 618 A.2d 513 (1993). The presence of the missing jacket at trial would not have been sufficient to cast reasonable doubt on the defendant's guilt. The state never maintained that the defendant wore the missing jacket at the time of the crime. Instead, the state claimed that the jacket found by Harris, which was introduced into evidence, was the jacket worn by the perpetrator. The importance of the missing jacket was further minimized by the results of the forensic test, which established that the jacket tested negative for bloodstains and gunshot residue. The results of those tests were disclosed to the jury. Accordingly, the missing jacket was at best collateral to the defendant's case.

The second *Asherman* factor we must consider is "the likelihood of mistaken interpretation of [the missing evidence] by witnesses or the [trier of fact]." (Internal quotation marks omitted.) *State* v. *Morales*, 39 Conn. App. 617, 626, 667 A.2d 68, cert. denied, 235 Conn. 938, 668 A.2d 376 (1995). "[T]he likelihood of such a mistake [by the jury and witnesses] can be minimized at the trial by permitting testimony on the issue . . . and by an appropriate instruction from the court permitting

the jury to draw an adverse inference against the state." (Citation omitted.) *State* v. *Leroux*, 18 Conn. App. 223, 233, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072 (1989). In light of the evidence offered at trial, it is unlikely that the jury developed a mistaken interpretation of the missing evidence. The jury was informed that the state failed to preserve this item of evidence. Robert O'Brien, a criminalist with the state police forensic laboratory, testified that after testing, his office returned this jacket to the state's attorney's office. In addition, O'Brien testified that both jackets tested negative for bloodstains and gunpowder residue. On cross-examination, O'Brien admitted that the state could not locate the jacket. Defense counsel also elicited information from O'Brien concerning tests he performed on the jacket. Defense counsel did not, however, ask the trial court to give the jury an adverse inference instruction concerning the state's failure to preserve this item of evidence.

In weighing the third *Asherman* factor, "the reason for the unavailability of the evidence, our cases have focused on the motives behind the destruction of the evidence." *State* v. *Leroux*, supra, 18 Conn. App. 231; *State* v. *Morales*, supra, 39 Conn. App. 626. "In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Citations omitted; internal quotation marks omitted.) *State* v. *Grillo*, 23 Conn. App. 50, 56, 578 A.2d 677 (1990). The record does not disclose any evidence that the state was motivated by bad faith, malice or any improper motive in failing to preserve the jacket.

Finally, in applying the fourth *Asherman* factor, we must consider the prejudice to the defendant caused by the unavailability of the jacket. The defendant claims that the state's failure to preserve the jacket prevented him from offering evidence that he always wore this jacket, as opposed to the jacket retrieved by Harris. The state's loss of the jacket did not, however, preclude the defendant from accomplishing this objective. Although the defendant could have questioned witnesses who knew or recognized him as to whether the jacket found by Harris was dissimilar to the one he wore every day, he failed to take advantage of that opportunity to offer independent evidence.

In considering the fourth *Asherman* factor, it is important that the state did not claim that the missing jacket was worn by the perpetrator, and that this jacket tested negative for bloodstains and gunpowder residue. Accordingly, it was of minimal evidentiary value to the defendant. There is no indication that production of the missing jacket would have strengthened his defense. See *State* v. *Harden*, 175 Conn. 315, 327, 398 A.2d 1169 (1978). Any prejudice to the defendant was, therefore, insubstantial.

In light of all the foregoing circumstances, we conclude that the defendant's state constitutional right to due process was not violated by the failure of the police to preserve the jacket.

B

The defendant also claims that the state's loss of the camouflage jacket violated his right of confrontation under article first, § 8, of the constitution of Connecticut[12] and the sixth[13] and fourteenth amendments to the

---

[12] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

[13] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and

United States constitution. Specifically, he claims that the loss of the jacket precluded him from meaningfully cross-examining the state's witnesses who testified that they had seen him wearing a camouflage or military style jacket. The defendant claims that had the missing jacket been available, he could have questioned those witnesses about whether they had seen him wearing this jacket or the jacket found by Harris, which the state alleges was the jacket worn by the perpetrator.

The defendant is entitled fully and fairly to confront and cross-examine the witnesses against him. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Maldonado*, 193 Conn. 350, 356, 478 A.2d 581 (1984). The primary interest secured by the right of confrontation is the right to cross-examine witnesses. *State* v. *Barrett*, 43 Conn. App. 667, 675, 685 A.2d 677 (1996), cert. denied, 240 Conn. 923, 692 A.2d 819 (1997). The defendant does have a right under the confrontation clause "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, [can] appropriately draw inferences relating to the reliability of the [state's] witness." *Davis* v. *Alaska*, supra, 318; *State* v. *Ouellette*, 190 Conn. 84, 101, 459 A.2d 1005 (1983). "The confrontation clause requires that [if] the testimony of such a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to discover any infirmities that may cast serious doubt upon its truthfulness." (Internal quotation marks omitted.) *State* v. *Morant*, 242 Conn. 666, 682, 701 A.2d 1 (1997). The right of

public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

cross-examination is not, however, absolute. *State* v. *Talton*, 197 Conn. 280, 284, 497 A.2d 35 (1985); *State* v. *Cooke*, 42 Conn. App. 790, 794, 682 A.2d 513 (1996).

The defendant was afforded an opportunity fully and fairly to cross-examine the state's witnesses who testified that they had seen him wearing a camouflage or military style jacket. "[A] defendant's right of [cross-examination] is not infringed if the defendant fails to pursue a line of inquiry open to him. . . . The test is whether the opportunity to cross-examine existed, not whether full use of such opportunity was made." (Internal quotation marks omitted.) see *State* v. *Bruno*, 236 Conn. 514, 533, 673 A.2d 1117 (1996); see *State* v. *Morant*, supra, 242 Conn. 684. The record does not reflect, nor does the defendant claim, that the trial court placed any restrictions on his ability to cross-examine state witnesses on this issue. Instead, the defendant alleges that the state's loss of the jacket impaired his right of cross-examination. The state's failure to preserve this jacket did not, however, preclude the defendant from using independent evidence for cross-examination purposes. Although the defendant was afforded an opportunity to cross-examine the state's witnesses on this issue, he failed to make full use of this opportunity. Accordingly, the state's loss of the jacket did not deprive the defendant of his state and federal constitutional rights of confrontation.

## IV

The defendant's fourth claim is that there was insufficient evidence to support his conviction for capital fel-

ony. When an appeal challenges the sufficiency of the evidence to justify a verdict of guilty, we have a twofold task. "We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict." *State* v. *Sinclair*, 197 Conn. 574, 576, 500 A.2d 539 (1985); *State* v. *Ferrell*, 191 Conn. 37, 46, 463 A.2d 573 (1983). "We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Sinclair*, supra, 576; *State* v. *Braxton*, 196 Conn. 685, 691, 495 A.2d 273 (1985); *State v. Cimino*, 194 Conn. 210, 211, 478 A.2d 1005 (1984).

"[In] viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994). "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." *State* v. *Sinclair*, supra, 197 Conn. 576. " 'In criminal cases, including the most serious ones, the fact that an accused was the person who committed the criminal act may be proved by circumstantial evidence.' " *State* v. *Rivera*, 32 Conn. App. 193, 201, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993). "It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circum-

stantial evidence." *State* v. *Perez*, 183 Conn. 225, 227, 439 A.2d 305 (1981).

The scope of our factual inquiry on appeal is limited. "We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record." *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). "Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991). This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986).

After a review of the record, we conclude that the jury reasonably could have determined that the cumulative effect of the evidence was sufficient to establish beyond a reasonable doubt that the defendant committed the crime of capital felony. The evidence in this case consisted almost exclusively of identification testimony from several witnesses. "It is uniquely the province of the trier of fact, in this case the jury, to determine the import of the evidence by gauging the credibility of the witnesses." *Berry* v. *Loiseau*, 223 Conn. 786, 821, 614 A.2d 414 (1992). "We have not had the jury's opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility." *State* v. *Stepney*, supra, 191 Conn. 255.

Numerous witnesses for the state directly tied the defendant to the crime, and the cumulative effect of this evidence was sufficient to establish the defendant's guilt beyond a reasonable doubt. Console, who lived on Howard Avenue, testified that he had seen the defendant on several prior occasions in that neighborhood.

Console observed that the defendant had braided hair and a mustache, and that he routinely wore an army jacket. Console testified that on the morning of October 17, 1990, he saw the defendant a short distance from the victim's car. Console was positive that the defendant was the person he saw near the victim's car that morning.

Mercado testified that on the morning of October 17, 1990, she was walking on Howard Avenue to meet her cousin before school. She observed a struggle inside a parked car between a black man and a white man. She testified that the black man had a mustache and regular size braids, and that he was wearing an army jacket. Mercado observed that the black man's braids were swinging as he slammed the car door against the white man's head. Mercado quickened her pace and when she heard two gunshots, she ran to her aunt's house. Approximately five minutes later, Mercado and her aunt returned to the victim's car. Mercado testified that the white man was dead and the black man was nowhere in sight. Although Mercado could not make a positive in-court identification, she testified that the defendant had similar braids and the same features as the perpetrator.

On the morning of October 17, 1990, Delgado, a resident of Howard Avenue, looked out his window and saw two men arguing across the street. Delgado testified that although there were tree branches outside his window, the branches did not obstruct his view of the incident. One man was inside a parked car and the other, a black man with camouflage clothing and braids, was leaning against the car. Although Delgado could see only the side of the black man's face, he recognized the man as someone he had seen before in that neighborhood. Delgado testified that he had never seen anyone else in that neighborhood who resembled the defendant. Shortly after Delgado turned away from the

scene, he heard two gunshots. He then looked out of his window and saw a young girl from the neighborhood, later identified as Mercado, running down the street. At trial, Delgado positively identified the defendant as the black man he had seen arguing with the victim minutes before the shooting. Delgado testified that he never saw the defendant enter the victim's car nor did he witness the shooting. The jury had before it all of this evidence and, therefore, it was in the best position to assess Delgado's credibility and to accept or reject his identification of the defendant. In making his identification, Delgado relied on his recollection of the defendant's braided hair and camouflage clothing, a description provided by Console, Mercado and several other of the state's witnesses. As our Supreme Court observed in the defendant's first appeal, "Whether these characteristics [braided hair and camouflage clothing] are sufficiently distinct trademarks is an inquiry that falls uniquely within the jury's province as fact finders." *State* v. *Jones*, supra, 234 Conn. 333.

Shortly after the incident, Hodge made a positive photograph identification of the defendant as the individual whom he had seen enter the victim's car in the early morning hours of October 17, 1990. Although Hodge later retracted the positive identification at trial, a rational juror could have credited Hodge's pretrial identification because it was given to the police shortly after the incident. In addition, the jury heard evidence that prior to recanting his identification, Hodge notified the police and the prosecutor's office that he had been receiving threats, that he was concerned about the welfare of himself and his family, and that he did not want to testify. Inconsistencies do not render a witness' testimony incredible as a matter of law. *State* v. *White*, 229 Conn. 125, 143–44, 640 A.2d 572 (1994). "The fact that certain testimony is . . . contradicted, does not make it insufficient to support a verdict if the testimony is

believed by the trier." *State* v. *Jones*, supra, 234 Conn. 333. Here, too, the jury was in the best position to observe Hodge's conduct in court and to assess whether his retraction was sincere or the result of fear.

Harris testified that she knew the defendant from that neighborhood. On the morning of October 17, 1990, she heard shots and moments later saw the defendant run toward her, remove a camouflage jacket and throw it in a dumpster. Harris retrieved the jacket, which contained a work order from a service station for a wheel alignment performed on the victim's car. The jury was informed that Harris was a drug addict and a police informant.[14] Harris testified that she did not ingest any drugs on the morning of October 17, 1990, and at the time she spoke with the police, she was informed that she would not be paid for her information in connection with this case. On October 21, 1990, Harris was unable to positively identify the defendant from a photographic array. The next day, however, she reviewed an array of photographs and positively identified the defendant as the person who had discarded the jacket in the dumpster. Harris testified that she had recognized the defendant's photograph when she was first shown the array, but she did not make a positive identification because she was concerned for her safety. When she learned that the defendant was in custody, she contacted the police and reviewed the photographs. Here, too, the jury was in the best position to decide whether Harris was testifying truthfully about seeing the defendant discard the coat that was later tied to the incident.

Several other witnesses for the state testified that the defendant frequented that neighborhood and that he

---

[14] At trial, Harris testified that she had been drug free for approximately five years and that she was employed in a community service organization. At the time of her testimony at the first trial in 1992, Harris had been drug free for approximately five months.

was recognizable because of his distinctive appearance. Esperanza Ramos, Mercado's aunt, testified that she saw the defendant walk by her home almost daily. She stated that the defendant had braided hair and that he always wore army clothing. Mercado testified that in the weeks preceding the victim's death, she had not seen anyone else in that neighborhood with such distinctive attributes. Rosalie Mongillo, who owned a local grocery store, testified that the defendant visited her store almost every day in the weeks prior to the homicide. She stated that the defendant wore army clothing and braids, and that she had not observed anyone else in that neighborhood with those distinctive trademarks.

DeMaio testified that on the morning of October 17, 1990, he was painting a house at 358-60 Howard Avenue. DeMaio saw a white man and a black man struggling inside a parked car. He heard two gunshots and saw the black man exit the car. DeMaio testified that he got a good look at the black man's face and that the defendant was not the man he saw exiting the victim's car. DeMaio further testified that the perpetrator was not wearing the camouflage jacket Harris turned over to the police and that the perpetrator's jacket bore an outline of the African continent. The state introduced evidence that DeMaio was incapable of clearly viewing the incident from his vantage point.[15] Moreover, DeMaio admitted that when the police interviewed him on October 17, 1990, he informed them that he did not witness the incident. When the police later visited DeMaio's home, he again stated that he did not see anything. In 1993, almost three years after the homicide, DeMaio contacted the authorities with information about the

---

[15] DeMaio testified that at the time of the murder, he was positioned on a ladder painting the porch of a residence located at 358–60 Howard Street. The state challenged DeMaio's ability to view the incident, given his position on the ladder under a porch overhang. The state also introduced photographic evidence that a large bush could have blocked DeMaio's line of vision.

incident. DeMaio testified that he came forward because he was contacted by the defendant's friends and he was no longer in fear of his safety. The jury was in the best position to observe DeMaio's demeanor in court and to assess whether he was testifying truthfully. On the basis of the evidence presented and the testimony of the state's witnesses, a rational juror could have reasonably rejected DeMaio's testimony.

This court has not had the jury's opportunity to observe the conduct, demeanor and attitude of the witnesses and, therefore, we cannot usurp the role of the jury and discredit the testimony of all of the state's witnesses as a matter of law. We conclude that the state adduced sufficient evidence on which, if credited, the jury could have reasonably concluded beyond a reasonable doubt that the defendant was guilty of capital felony.

V

The defendant's final claim is that the trial court improperly presented an incomplete and misleading summary of the evidence to the jury in violation of article first, § 19, of the constitution of Connecticut[16] and the sixth amendment to the United States constitution. Specifically, the defendant argues that the trial court, in responding to an interrogatory submitted by the jury, failed to mention relevant testimony from DeMaio, a defense witness. The defendant contends that the trial court's omission indirectly discredited

---

[16] Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

DeMaio's testimony, thereby depriving him of his state and federal constitutional rights to have the jury decide fundamental factual issues without undue influence from the trial court.

Defense counsel did not take an exception to the trial court's response to the jury's interrogatory. In fact, defense counsel participated in the formulation of this response. In addition, the defendant has failed to request that we review his unpreserved claim under the standard set forth in *Golding*.

Even if we assume, without deciding, that there was a misstatement of the testimony, "the question before us would be whether the trial court abused its discretion . . . which is not a matter of constitutional dimensions." (Citations omitted.) *State* v. *DeMatteo*, 186 Conn. 696, 704, 443 A.2d 915 (1982). Because the defendant's claim is not of constitutional magnitude and was not properly preserved, it merits no further consideration.

The judgment is affirmed.

In this opinion the other judges concurred.